OPINION OF THE COURT
Jasen, J.
We are asked on this appeal to determine whether or not the defendant airline properly exercised its authority under the Federal Aviation Act in refusing to transport plaintiff, an invalid paralyzed from the waist down as a result of an undiagnosed illness, on the flight in question.
In January, 1972, plaintiff was stricken with an undiagnosed illness while residing in Haiti. Her affliction first manifested itself on January 21 and during the next 10 days plaintiff suffered chest pains, weakened legs and incontinence. She consulted a number of local physicians who took X rays and performed a variety of blood tests and neurological examinations, all of which proved inconclusive. Finally, after becoming totally paralyzed from the waist down, plaintiff was advised to seek medical attention in the United States.
One of plaintiff’s friends, Mrs. Thelma Hamaty, made arrangements with defendant American Airlines on January 31 for plaintiff to fly to New York City the following day. Mrs. Hamaty informed one of defendant’s agents, Mr. *45 Bayard, that plaintiff was paralyzed and in need of a wheelchair. Mrs. Hamaty further explained that plaintiff could sit up and that her condition was not contagious. Thereupon, a first-class ticket was issued in plaintiff’s name.
On February 1, plaintiff arrived at the Port-au-Prince airport in an ambulance approximately 45 minutes before her flight was scheduled to depart. As the ambulance attendants and defendant’s employees were transferring plaintiff to a boarding wheelchair, she repeatedly cried out in pain. After being strapped into the wheelchair, plaintiff was wheeled toward the airplane. Throughout this process, she was crying, sobbing and obviously experiencing extreme discomfort. Defendant’s personnel then noticed, for the first time, that plaintiff had a catheter and a Foley disposal bag attached to her body. At that point, it was decided by the airline that plaintiff’s health and the safety of the other passengers would be jeopardized if plaintiff was allowed to travel on that flight. Consequently, plaintiff was denied passage.
As the airplane taxied towards the runway in preparation for takeoff, Mrs. Hamaty, for the first time, offered to accompany plaintiff on the flight. The offer was refused for the same reasons plaintiff was denied permission to board.
Plaintiff flew to New York City on Pan American Airlines two days later. She was admitted to Columbia Presbyterian Hospital on February 3, 1972, where doctors diagnosed an mtermedulla hematoma on her spinal cord. The surgery performed on February 4, 1972 was unsuccessful and plaintiff remains paralyzed from the waist down.
Thereafter, this action for money damages was commenced wherein it was alleged that defendant was negligent in refusing to accept plaintiff for passage and that the two-day delay in transporting her to New York proximately caused her permanent paralysis. After a trial before a jury, defendant moved for a directed verdict claiming, inter alia, that defendant’s decision to deny passage to *46 plaintiff should not be evaluated by a negligence standard. The motion was denied and the action was submitted to the jury to decide whether the defendant was negligent in refusing plaintiff passage to New York.
The jury returned a verdict of $525,000, which was reduced by the trial court to $500,000, the amount of the ad damnum. On appeal, the Appellate Division affirmed, with one Justice dissenting.
The question before us is whether the airline, in refusing passage to the plaintiff in Haiti, properly exercised its authority of refusal under the Federal Aviation Act. We hold that it did.
Section 1111 of the Federal Aviation Act (US Code, tit 49, § 1511) was enacted by Congress in 1961 authorizing an air carrier to deny passage to any person “when, in the opinion of the carrier, such transportation would or might be inimical to safety of flight.”[1] While it was originally enacted to help combat the serious problem of air piracy (1 US Code Cong & Admin News, 1961, 87th Cong, 1st Sess, pp 520-522; 2 US Code Cong & Admin News, 1961, 87th Cong, 1st Sess, pp 2563-2582), the statute has not been so restrictively applied. (See Angel v Pan Amer. World Airways, 519 F Supp 1173 [refusing passage to handicapped child]; Williams v Trans World Airlines, 509 F2d 942 [refusing passage to wanted criminal]; Cordero v CIA.
*47 Mexicana De Aviacion, SA., 681 F2d 669 [refusing to allow unruly passenger to reboard].)
In implementation of section 1511, defendant filed with the Civil Aeronautics Board its International Passenger Rules Tariff No. PR-2, which, inter alia, allows defendant to “refuse to carry, cancel the reserved space of, or remove enroute any passenger” when the passenger’s physical condition is such as to require special assistance or poses a hazard to himself or others.[2] It is conceded that this tariff has the force of law.
A reading of section 1511 and the tariff filed by the airline makes it abundantly clear that the decision to accept or refuse a passenger for air carriage lies exclusively with the airline. The law endows the airline with discretion in accepting or rejecting a passenger, based upon considerations of safety and problems inherent to air travel, and that such discretion, if exercised in good faith and for a rationál reason, must be accepted. This is understandable when one considers that an airline usually must make such decisions on the spur of the moment, shortly before takeoff, without the benefit of complete and accurate information. There are times when legitimate safety reasons require that the decision be based entirely on a prospective passenger’s appearance and behavior. (See Austin v Delta Airlines, 246 So 2d 894 [La].) Likewise, *48 where in its judgment a sick or invalid person will require extraordinary individual care due to his or her condition, so as to interfere with the airline’s duty to other passengers, the airline may refuse passage to that individual.
We do not believe that Congress, in enacting the Federal Aviation Act, intended to test the airline’s discretion to deny passage to certain persons by standards of negligence. “[AJirline safety is too important to permit a safety judgment made by the carrier * * * to be second-guessed months later in the calm of the courtroom by a judge or a jury, having no responsibility for the physical safety of anyone, on the basis of words which are inadequate to convey the degree of excitement and tenseness existing at the time the judgment was made.” (Cordero v CIA. Mexicana De Aviacion, S.A., 512 F Supp 205, 206-207, revd in part and affd in part 681 F2d 669, supra.)
We hold, therefore, that the trial court erred in submitting to the jury the question of whether the airline acted negligently in refusing to allow plaintiff to board. The determination whether to carry a sick or invalid person lies within the discretion of the carrier, and the standard which should be applied in reviewing the discretion exercised by the carrier, under the facts and circumstances known by the carrier at the time the decision was made, is whether the decision was arbitrary, capricious or irrational, constituting an. abuse of the discretion vested by law in the carrier. (See Williams v Trans World Airlines, 509 F2d 942, 948; see, also, Note, 40 J Air L & Commerce 767, 776 [1974].)
Applying this standard to the facts of this case, we hold that, as a matter of law, defendant did not abuse its discretion in refusing to transport plaintiff to New York. As Justice Silverman correctly stated in his dissent, “[h]ere the airline saw the passenger for the first time three quarters of an hour before departure time, and then for the first time could see concretely how ill the passenger was. It was obvious that the proposed passenger was very sick. The illness was undiagnosed; the possibility of infectious origin had not been ruled out; her legs were paralyzed; she was brought to the airfield in an ambulance on a stretcher and taken from the stretcher to a wheelchair. She *49 obviously experienced great pain and suffering in the very act of being transferred and placed in the wheelchair and of sitting in the wheelchair. She had a catheter, in her attached to a Foley * * * disposal bag. No special preparations, other than the wheelchair — nor any modification of seats — had been made or requested to accommodate her. There was no way of knowing what assistance she might need in the course of the proposed three-hour flight, much of it over ocean. She was traveling alone. Only after the plane had started to taxi on the runway did the friend who was with plaintiff at the airport suggest that she would be willing to accompany the plaintiff to New York.” (87 AD2d 785-786.) Consequently, based upon plaintiff’s condition as it appeared to the airline on February 1, we do not believe that defendant abused its discretion in refusing to transport plaintiff to New York City at that time.[3]
Additionally, plaintiff argues that, apart from the airline’s discretion to refuse to transport her to New York, defendant was negligent in failing to obtain information necessary to make that decision. We disagree.
As discussed earlier, the decision to refuse to transport a prospective passenger often must be made on the spur of the moment. It would, therefore, be imposing an impossible burden on an airline to require that it make a thorough investigation into the nature and extent of a person’s illness before reaching that decision. To adopt such a rule would effectively curtail or eliminate the discretion vested by Congress in the airlines to refuse passage to persons whose presence, in the opinion of the airline, would be inimical to the safety of the flight. We believe that Congress intended airlines to have broad but not unlimited discretion to make such decisions. (See Williams v Trans World Airlines, 509 F2d 942, 948, supra.) Absent a showing of arbitrariness, plaintiff’s argument that defendant was negligent in failing to obtain information necessary to make its decision is unpersuasive. In this case, there was no showing of arbitrariness as a matter of law.
*50 We emphasize that our decision today does not authorize air carriers to unjustly discriminate against sick, elderly or handicapped persons. The carrier’s decision to refuse passage to any person must be premised on a valid concern for the safety of the flight and the individuals on that flight. A carrier who uses the safety issue as a sham in order to accomplish another purpose will not be insulated from liability. (Cordero v CIA. Mexicana De Aviacion, S.A., 512 F Supp 205, 207, revd in part and affd in part 681 F2d 669, supra.) Congress expressly prohibited such conduct when it enacted subdivision (b) of section 404 of the Federal Aviation Act (US Code, tit 49, § 1374, subd [b]).[4]
Accordingly, the order of the Appellate Division should be reversed and the complaint dismissed.
Chief Judge Cooke and Judges Gabrielli, Jones and Meyer concur with Judge Jasen; Judge Wachtler concurs in result for reasons stated in the dissenting memorandum of Justice Samuel J. Silverman at the Appellate Division (87 AD2d 785-786); Judge Fuchsberg taking no part.
Order reversed, with costs, and the complaint dismissed.

. Section 1511, in full, provides:
“(a) The Administrator shall, by regulation, require any air carrier, intrastate air carrier, or foreign air carrier to refuse to transport “(1) any person who does not consent to a search of his person, as prescribed in section 1356(a) of this title, to determine whether he is unlawfully carrying a dangerous weapon, explosive, or other destructive substance, or “(2) any property of any person who does not consent to a search or inspection of such property to determine whether it unlawfully contains a dangerous weapon, explosive, or other destructive substance.
“Subject to reasonable rules and regulations prescribed by the Administrator, any such carrier may also refuse transportation of a passenger or property when, in the opinion of the carrier, such transportation would or might be inimical to safety of flight.
“(b) Any agreement for the carriage of persons or property in air transportation or intrastate air transportation by an air carrier, intrastate air carrier, or foreign air carrier for compensation or hire shall be deemed to include an agreement that such carriage shall be refused when consent to search such persons or inspect such property for the purposes enumerated in subsection (a) of this section is not given.”

'2. Tariff No. PR-2 provides in pertinent part:
“LIMITATIONS OF CARRIAGE.
“(A) Refusal, Cancellations or Removal.
“(1) Carrier will refuse to carry, cancel the reserved space of, or remove enroute any passenger when:
“(a) such action is necessary for reasons of safety;
“(b) such action is necessary to prevent violation of any applicable laws, regulations, or orders of any state or country to be flown from, into or over;
“(c) the conduct, age or mental or physical condition of the passenger is such as to “(i) require special assistance of carrier; or
“(ii) cause discomfort or make himself objectionable to other passengers; or “(iii) involve any hazard or risk to himself or to other persons or to property.
“(d) Passengers and their baggage are subject to inspection with an electronic detector with or without the passenger’s consent or knowledge.
“(2) If question arises of any aircraft’s being overloaded, Carrier shall decide which passengers or articles will be carried.”

. Under its International Passenger Rules Tariff No. PR-2 (supra) defendant has the authority to cancel a passenger’s reserved space, as well as to refuse to issue a ticket in the first place.

. Subdivision (b) of section 1374 provides that: “No air carrier or foreign air carrier shall make, give, or cause any undue or unreasonable preference or advantage to any particular person, port, locality, or description of traffic in air transportation in any respect whatsoever or subject any particular person, port, locality, or description of traffic in air transportation to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever.” Since plaintiff does not rely on subdivision (b) of section 1374, we do not reach the question whether defendant unjustly discriminated against plaintiff.